

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-29-2006

# EI DuPont de Nemours v. USA

Precedential or Non-Precedential: Precedential

Docket No. 04-2096

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"EI DuPont de Nemours v. USA" (2006). *2006 Decisions.* Paper 492.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/492

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-2096

E.I. DUPONT DE NEMOURS AND COMPANY;
CONOCO, INC.; SPORTING GOODS PROPERTIES, INC.,
Appellants

v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF COMMERCE;
UNITED STATES DEPARTMENT OF DEFENSE;
UNITED STATES DEPARTMENT OF THE ARMY;
UNITED STATES DEPARTMENT OF ENERGY;
UNITED STATES DEPARTMENT OF THE INTERIOR;
UNITED STATES DEPARTMENT OF THE NAVY

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 97-cv-00497
District Judge: Honorable William J. Martini

Argued April 17, 2006

Before: SLOVITER, AMBRO and MICHEL,[*] <u>Circuit Judges</u>

(filed: August 29, 2006)

John McGahren, Esquire
Patton Boggs
One Riverfront Plaza, 6th Floor
Newark, NJ   07102

William H. Hyatt, Jr. (Argued)
Kirkpatrick & Lockhart
Nicholson Graham
One Newark Center, 10th Floor
Newark, NJ   07102

     Counsel for Appellants

Kelly A. Johnson
   Acting Assistant Attorney General
Michael D. Rowe, Esquire
Scott Jordan, Esquire
David M. Thompson, Esquire
Eric G. Hostetler, Esquire
Michele L. Walter, Esquire
David C. Shilton, Esquire
Ellen J. Durkee, Esquire (Argued)

---

[*] Honorable Paul R. Michel, Chief Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

John T. Stahr, Esquire
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C.   20026

      Counsel for Appellees

Michael W. Steinberg, Esquire
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C.   20004

      Counsel for Amicus-Appellants
      Superfund Settlements Project and
      American Chemistry Council

---

OPINION  OF  THE  COURT

---

AMBRO, Circuit Judge

Appellants in this case are owners and operators of industrial facilities located throughout the United States that are contaminated with hazardous waste.  They admit they are responsible for some of the contamination at these sites (which they cleaned up voluntarily), but allege the United States

Government is also responsible for some part. They thus seek a ruling that the Government must contribute to them a share of the cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. Two of our precedents — New Castle County v. Halliburton NUS Corp., 111 F.3d 1116 (3d Cir. 1997), and Matter of Reading Co., 115 F.3d 1111 (3d Cir. 1997) — limit their claim. New Castle County limits potentially responsible parties to an express cause of action for contribution under CERCLA § 113, 42 U.S.C. § 9613 (thus barring them from another type of claim called "cost recovery" under CERCLA § 107(a), 42 U.S.C. § 9607(a)).[1] Reading held that § 113 also replaced any implied or common law causes of action for contribution by potentially responsible parties with an exclusive statutory remedy.

In Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157 (2004), the Supreme Court held that § 113 by its express terms is not available to parties that clean up sites voluntarily. Appellants now ask that we decide whether, in light of Cooper Industries, our decisions in New Castle County and Reading limiting contribution to § 113 should be reconsidered to allow them to clean up their sites voluntarily and still share

---

[1] Because almost all relevant cases refer to the sections of CERCLA rather than the codification of those sections in the United States Code, we generally follow suit, except for the initial reference to a new section of the statute.

4

the costs with others. We conclude that Cooper Industries does not give us cause to reconsider our precedents here. Hence, because appellants are themselves partly responsible for the contamination at the subject sites, and their cleanups were voluntary, they may not seek contribution from other potentially responsible parties (including the Government).

## I. Legal Framework

Before considering the factual background and procedural history of this case, it is necessary first to understand the applicable legal framework. In 1980, Congress enacted CERCLA to remedy the "serious environmental and health risks posed by pollution." United States v. Bestfoods, 524 U.S. 51, 55 (1998). CERCLA is a broad remedial statute that "grants the President . . . power to command government agencies and private parties to clean up hazardous waste sites," Key Tronic Corp. v. United States, 511 U.S. 809, 814 (1994), and provides that "everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup," Bestfoods, 524 U.S. at 56 n.1 (emphasis and internal quotation marks omitted); see Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 676 (3d Cir. 2003) (noting that "[t]wo of the main purposes of CERCLA are prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party" (internal quotation marks omitted)). Unfortunately, "CERCLA is not a paradigm of clarity or precision [due to] inartful drafting and numerous ambiguities

attributable to its precipitous passage." <u>Artesian Water Co. v. Gov't of New Castle County</u>, 851 F.2d 643, 648 (3d Cir. 1988); <u>see also</u> <u>Exxon Corp. v. Hunt</u>, 475 U.S. 355, 363 (1986) (noting that many CERCLA provisions are "not . . . model[s] of legislative draftsmanship," and are "at best inartful and at worst redundant"). As one court has noted, "wading through CERCLA's morass of statutory provisions can often seem as daunting as cleaning up one of the sites the statute is designed to cover." <u>CadleRock Props. Joint Venture, L.P. v. Schilberg</u>, No. 3:01CV896, 2005 WL 1683494, at *5 (D. Conn. July 19, 2005).

This case requires us to dive head-first into a particularly convoluted area of the law: apportionment of cleanup costs among potentially responsible parties ("PRPs").[2] <u>See</u> <u>Artesian</u>

---

[2] "Potentially responsible party" and "PRP" are not used in CERCLA, but rather are terms of art used by courts and the federal Environmental Protection Agency ("EPA") to refer to parties that potentially bear some liability for the contamination of a site. <u>See, e.g.</u>, <u>New Castle County</u>, 111 F.3d at 1120 n.2; <u>see also</u> <u>United States v. E.I. DuPont de Nemours & Co., Inc.</u>, 432 F.3d 161, 182-83 (3d Cir. 2005) (<u>en banc</u>) (Rendell, J., dissenting) (citing EPA policy manuals). <u>But see</u> <u>Consol. Edison Co. of N.Y. v. UGI Utils., Inc.</u>, 423 F.3d 90, 97 n.8 (2d Cir. 2005) (criticizing the use of "'potentially responsible person' and 'PRP'" because they "do not appear anywhere in the text of . . . CERCLA" and are "vague and imprecise," and relying instead on an "alternative designation — a party that, if

6

<u>Water</u>, 851 F.2d at 648 (noting that CERCLA's "difficult[ies] [are] particularly apparent in the response costs area").  Several sections of CERCLA are relevant to this issue.

**A.      Sections 106 and 107**

Under CERCLA § 106(a), 42 U.S.C. § 9606(a) the United States may take action to "secure such relief as may be necessary to abate" a "substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." CERCLA § 107(a), 42 U.S.C. § 9607(a), defines "covered persons" who are liable for these and other costs as:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or

sued, would be held liable . . .").

7

arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

CERCLA § 107(a)(1)-(4). These covered persons "shall be liable for":

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe, not inconsistent with the

8

[N]ational [C]ontingency [P]lan;[3]

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

Id. § 107(a)(4)(A)-(D).

---

[3] The National Contingency Plan is "a set of regulations promulgated by the EPA that establishes procedures and standards for responding to releases of hazardous substances, pollutants and contaminants." New Castle County, 111 F.3d at 1120 n.2 (citing 42 U.S.C. § 9605 and 40 C.F.R. pt. 300).

9

**B.     Section 113**

In 1986, Congress passed the Superfund Amendments and Reauthorization Act ("SARA"), Pub. L. No. 99-499, 100 Stat. 1613.  SARA amended CERCLA to add CERCLA § 113, 42 U.S.C. § 9613, which provides, in subsection (f)(1):

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) [CERCLA § 107(a)] of this title, during or following any civil action under section 9606 [CERCLA § 106] of this title or under section 9607(a) [CERCLA § 107(a)] of this title. . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 [CERCLA § 106] of this title or section 9607 [CERCLA § 107] of this title.

10

CERCLA § 113(f)(1). The section also provides that: (1) a PRP that "has resolved its liability to the United States or a State in an administrative or judicially approved settlement" is immune from claims for contribution from other PRPs "regarding matters addressed in the settlement," id. § 113(f)(2); (2) a settling PRP can seek contribution from other non-settling PRPs, id. § 113(f)(3)(B); and (3) the statute of limitations for an action under § 107(a) is six years, while the statute of limitations for an action under § 113(f)(1) is only three years, id. § 113(g).

## C.    Section 120

CERCLA § 120(a)(1), 42 U.S.C. § 9620(a)(1), also enacted as part of the 1986 SARA amendments, contains a broad waiver of the United States' sovereign immunity, providing that "[e]ach department, agency, and instrumentality of the United States" is subject to CERCLA's provisions "in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 [CERCLA § 107] of this title." See FMC Corp. v. U.S. Dep't of Commerce, 29 F.3d 833, 840 (3d Cir. 1994) (en banc) ("[W]hen the government engages in activities that would make a private party liable [under CERCLA] if the private party engaged in those types of activities, then the government is also liable. This is true even if no private party could in fact engage in those specific activities." (emphases omitted)).

11

### D. Evolution of Liability Under CERCLA and SARA

#### 1. Pre-SARA Liability: Implied Contribution Rights

Prior to the enactment of the SARA amendments in 1986, several courts held that CERCLA exposed PRPs to joint and several liability, and that this implied a right of contribution among joint tortfeasors. See, e.g., United States v. S.C. Recycling & Disposal, Inc., 653 F. Supp. 984, 994 (D.S.C. 1986), vacated in part on other grounds sub nom. United States v. Monsanto Co., 858 F.2d 160 (4th Cir. 1988); United States v. Chem-Dyne Corp., 572 F. Supp. 802, 807-08, 810 (S.D. Ohio 1983). Innocent parties were allowed to recover their full response costs from any PRP under § 107(a)(4)(B), see Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 889, 891-92 (9th Cir. 1986); Walls v. Waste Res. Corp., 761 F.2d 311, 317-18 (6th Cir. 1985), and PRPs were allowed contribution pursuant to either an implied cause of action under § 107, see City of Phila. v. Stepan Chem. Co., 544 F. Supp. 1135, 1142-43 (E.D. Pa. 1982), or the common law, see United States v. New Castle County, 642 F. Supp. 1258, 1267-69 (D. Del. 1986) (hereafter "NCC"); Colorado v. ASARCO, Inc., 608 F. Supp. 1484, 1489-90, 1491 (D. Colo. 1985). As the Supreme Court has explained, these cases allowed private parties, including PRPs, to seek contribution for costs incurred in forced or voluntary cleanups. See, e.g., Cooper Indus., 543 U.S. at 161-62

12

(citing cases); <u>Reading</u>, 115 F.3d at 1118-19 (same, and noting that, "[u]ntil the passage of SARA in 1986, the judicially[ ] created expansion of § 107(a)(4)(B) served as the sole means by which parties could obtain contribution").

2.      <u>Post-SARA Liability: Cost Recovery and Contribution Actions</u>

Following the passage of SARA and the inclusion of § 113 in CERCLA (which specifically provides contribution rights), courts retreated from implied causes of action for PRPs to seek contribution under § 107(a). Instead, they interpreted §§ 107 and 113 as establishing two "clearly distinct" remedies: "cost recovery" under § 107(a), and "contribution" under § 113(f). <u>See, e.g.</u>, <u>Cooper Indus.</u>, 543 U.S. at 163 & n.3; <u>Morton Int'l</u>, 343 F.3d at 675 ("Accordingly, CERCLA and SARA together create two legal actions by which parties that have incurred costs associated with cleanups can recover some or all of those costs: (1) Section 107 cost recovery actions; and (2) Section 113 contribution actions.").

In <u>New Castle County</u>, we determined that a cost recovery action under § 107 is not available to a PRP.[4] Rather,

---

[4] The plaintiffs in <u>New Castle County</u> incurred response costs pursuant to an EPA consent decree that "requir[ed] them to finance and implement remedial action at the landfill." 111 F.3d at 1119.

"a section 107 action brought for recovery of costs may be brought only by <u>innocent</u> parties that have undertaken clean-ups. <u>An action brought by a potentially responsible person is by necessity a section 113 action for contribution</u>." New Castle County, 111 F.3d at 1120 (second emphasis added). We based our conclusion on the understanding that, although § 107 is not limited by its terms to innocent parties, the section "was designed to enable innocent persons who incur expenses cleaning up a site to recover their costs from potentially responsible persons," and thus "a potentially responsible person does not experience section 107 injury and cannot obtain section 107 relief." Id. at 1122.[5]  Indeed, because § 107 imposes strict, joint, and several liability on all PRPs for the costs of cleanup, a PRP allowed to bring a cost recovery action under § 107 against another PRP "could recoup <u>all</u> of its expenditures regardless of fault" — which, we noted, "strains logic." Id. at 1120-21 (emphasis in original).  Moreover, we concluded that it made little sense to allow a PRP the choice of proceeding under either § 107 or § 113, because parties would always choose § 107 (which allows recovery based on joint and several

_____

[5]  Of course, § 107 also renders PRPs liable to federal and state governments and Indian tribes, and thus those parties (acting in their enforcement capacity, and not as PRPs) may bring § 107 cost recovery actions as well.  See CERCLA § 107(a)(4)(A); New Castle County, 111 F.3d at 1123 (noting that "section 107 historically has been used by governments to recover costs incurred in the clean-up of hazardous sites").

14

liability with a six-year statute of limitations) over § 113 (which allows recovery based on equitable apportionment of costs with a three-year statute of limitations), thus "render[ing] section 113 a nullity." Id. at 1123.[6]

In Reading, decided a few weeks after New Castle County, we held that a PRP also may not invoke the pre-SARA implied cause of action for contribution under § 107.[7] Examining the legislative history of § 113, we noted that the section was intended to "'clarif[y] and confirm[] the right of a person held jointly and severally liable under CERCLA to seek

[6] Numerous other Courts of Appeals considering this issue have reached the same result. See, e.g., Bedford Affiliates v. Sills, 156 F.3d 416, 423-424 (2d Cir. 1998); Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 349-356 (6th Cir. 1998); Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co., 142 F.3d 769, 776 (4th Cir. 1998); Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1301-06 (9th Cir. 1997); Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1496 & n. 7 (11th Cir. 1996); United States v. Colo. & E. R.R. Co., 50 F.3d 1530, 1534-1536 (10th Cir. 1995); United Techs. Corp. v. Browning-Ferris Indus., 33 F.3d 96, 98-103 (1st Cir. 1994); Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994).

[7] The plaintiff in Reading incurred response costs pursuant to an EPA cleanup order under § 106 and a corresponding suit under § 107. 115 F.3d at 1116.

contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.'"  Reading, 115 F.3d at 1119 (quoting S. Rep. No. 99-11, at 44 (1985)) (alterations in original); see also New Castle County, 111 F.3d at 1122 (same, quoting H.R. Rep. No. 99-253(I), at 79 (1985)).  Based on the statute's language, the legislative history, relevant case law, and "the fact that § 113(f)(1) specifically permits an action for contribution to be brought 'in the absence of a civil action under . . . section [107],'" Reading, 115 F.3d at 1120 (alterations in original),[8] we held that, "[i]n passing § 113(f), Congress acted to codify existing federal common law and to replace the judicially crafted measure with an express statutory remedy."  Id. at 1119.

Thus we concluded that "Congress intended § 113 to be the sole means for seeking contribution."  Id. at 1120 (emphasis added).  It "replaced the judicially created right to contribution under § 107(a)(4)(B)" with an express (and exclusive) statutory remedy, id. at 1119, and also superseded common law remedies:

> [W]hen Congress expressly created
> a statutory right of contribution in

_____

[8]  As noted below, insofar as this quoted passage from Reading implies that § 113(f)(1) contribution is available without a preexisting suit, the Supreme Court ruled otherwise in Cooper Industries.

16

CERCLA § 113(f), 42 U.S.C. § 9613(f), it made that remedy a part of an elaborate settlement scheme aimed at the efficient resolution of environmental disputes. Permitting independent common law remedies would create a path around the statutory settlement scheme, raising an obstacle to the intent of Congress. We conclude therefore that [the plaintiff's] common law claims are preempted by CERCLA § 113(f).

Id. at 1117.

In so holding, we acknowledged dicta in the Supreme Court's decision in Key Tronic that "§ 107 unquestionably provides a cause of action for private parties to seek recovery of cleanup costs," 511 U.S. at 818, and that CERCLA "expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107," id. at 816. See Reading, 115 F.3d at 1120. We determined, however, that the "overlap" consisted of the fact that (as New Castle County held) an innocent private party (most likely a landowner who purchased land that had been contaminated by others) may bring a cost recovery action under § 107 holding a PRP jointly and severally liable for the full cost

17

of the cleanup. <u>Reading</u>, 115 F.3d at 1120. "The fact, however, that a direct action might be brought under § 107(a) [by an innocent landowner against a PRP] does not open the door for [the] PRP to bring an action for contribution [against other PRPs] under that same section." <u>Id.</u>

In sum, after SARA introduced the § 113 contribution provision, our Court and other courts concluded that §§ 107 and 113 were complementary (but not really "overlapping," as the Supreme Court had suggested in <u>Key Tronic</u>) remedies. Section 107 allowed the Government or an innocent landowner to recover the full cost of cleanup from a PRP on the basis of strict, joint, and several liability. The PRP could then seek contribution from other PRPs under § 113(f)(1). Moreover, according to the understanding at that time (as intimated in <u>Reading</u>), § 113(f)(1) allowed a PRP to seek contribution even in the absence of an action under § 106 or § 107; in other words, a PRP that voluntarily cleaned up a contaminated site <u>sua sponte</u> could seek contribution from other PRPs without waiting for an enforcement action, a Government or innocent-landowner cost recovery suit, or a settlement of liability.

3.    Cooper Industries

In <u>Cooper Industries</u>, the Supreme Court significantly altered this understanding. The Court held that the plain language of § 113(f)(1) (<u>i.e.</u>, "Any person may seek contribution from any other person who is liable or potentially liable under

18

section [107] of this title, during or following any civil action under section [106] of this title or under section [107] of this title.") required a pre-existing civil action (either pending or completed) against the PRP under § 106 or § 107 before the PRP could seek contribution from other PRPs. The Court concluded that, "if § 113(f)(1) were read to authorize contribution actions at any time, regardless of the existence of a § 106 or § 107(a) civil action, then Congress need not have included the explicit 'during or following' condition" in § 113(f)(1). Cooper Indus., 543 U.S. at 166. Thus, a PRP may only seek contribution under § 113(f)(1) if it is the subject of a § 106 or § 107 civil action or has been adjudged liable as a result of such an action. Id.[9]

The Court also considered the so-called "saving clause" of § 113(f)(1) ("Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section [106] of this title or section [107] of this title."). We relied on this sentence in Reading when we said that § 113(f)(1) "specifically permits" a PRP to seek contribution from other PRPs without a pre-existing action under § 106 or § 107. 115 F.3d at 1120. Insofar as this

---

[9] The Court also noted that, under § 113(f)(3)(B), a PRP that has settled its liability to the federal or a state government also has a right to seek contribution. That right, the Court noted, is "a separate express right of contribution" independent of § 113(f)(1). Cooper Indus., 543 U.S. at 163.

19

statement implied that § 113(f)(1) permitted such an action, the Supreme Court disagreed, noting that "[t]he sole function of the [saving clause] is to clarify that § 113(f)(1) does nothing to 'diminish' any cause(s) of action for contribution that may exist independently of § 113(f)(1)." Cooper Indus., 543 U.S. at 166 (emphasis added). As the Court explained,

> the sentence [i.e., the saving clause] rebuts any presumption that the express right of contribution provided by the enabling clause [in § 113(f)(1)] is the exclusive cause of action for contribution available to a PRP. The sentence, however, does not itself establish a cause of action; nor does it expand § 113(f)(1) to authorize contribution actions not brought "during or following" a § 106 or § 107(a) civil action; nor does it specify what causes of action for contribution, if any, exist outside § 113(f)(1). Reading the saving clause to authorize § 113(f)(1) contribution actions not just "during or following" a civil action, but also before such an action, would again violate the settled rule

20

> that we must, if possible, construe a
> statute to give every word some
> operative effect.

Id. at 166-67.

The Court left open the questions of whether a PRP may seek cost recovery under § 107, and whether that section includes an implied cause of action for contribution on which a PRP may rely independently of § 113. With respect to the former question, the Court noted that numerous decisions from the Courts of Appeals, including this Court's decision in New Castle County, had held that a § 107(a) cost recovery action is only available to an innocent party, and concluded that the question had not been briefed to the Supreme Court and thus it was "more prudent to withhold judgment on these matters." Cooper Indus., 543 U.S. at 169-70. While the Court did not reach the latter issue as well, it drew the litigants' attention to those cases in which "this Court has visited the subject of implied rights of contribution before," id. at 170-71 (citing Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 638-47 (1981), and Northwest Airlines, Inc. v. Transp. Workers Union of Am., 451 U.S. 77, 90-99 (1981)). It noted further that, "in enacting § 113(f)(1), Congress explicitly recognized a particular set (claims 'during or following' the specified civil actions) of the contribution rights previously implied by courts from provisions of CERCLA and the common law." Id. at

21

171.[10]

[10]  In dissent, Justice Ginsburg relied heavily on the Court's dicta in Key Tronic that § 107 "unquestionably provides a cause of action for private parties to seek recovery of cleanup costs," see Key Tronic, 511 U.S. at 118, a proposition she believed applied to PRPs.  Cooper Indus., 543 U.S. at 172 (Ginsburg, J., dissenting).  She argued that "all Members of this Court agreed" that § 107 provided such a cause of action.  Id.  Indeed, Justice Scalia's dissent in Key Tronic focused merely on whether the cause of action was express (as he believed it was) or implied (as the majority stated).  See Key Tronic, 511 U.S. at 822 (Scalia, J., dissenting in part).  Justice Ginsburg thus concluded that "no Justice [in Key Tronic] expressed the slightest doubt that § 107 indeed did enable a PRP to sue other covered persons for reimbursement, in whole or part, of cleanup costs the PRP legitimately incurred," and thus would have recognized a cause of action for PRPs to seek contribution under § 107.  Cooper Indus., 543 U.S. at 172, 174 (Ginsburg, J., dissenting).

Justice Ginsburg's conclusion presumes, however, that the "private parties" the Court agreed in Key Tronic had a cause of action under § 107 included PRPs seeking contribution from other PRPs, and not merely (as we held in Reading and New Castle County) innocent private parties seeking cost recovery from PRPs on a joint and several basis.  The Cooper Industries majority appears to agree with our view, retreating significantly from its earlier dicta and noting that, although the Key Tronic majority spoke of "'similar and overlapping' remedies[,] . . . [t]he cost recovery remedy of § 107(a)(4)(B) and the contribution remedy of § 113(f)(1) are similar at a general level

## II. Facts and Procedural History

With this context, we turn to the facts of this case. Appellants E.I. DuPont de Nemours & Co., ConocoPhillips Co., and Sporting Goods Properties, Inc. (collectively "DuPont" or "appellants")[11] appeal from a March 1, 2004 order of the United States District Court for the District of New Jersey granting the United States judgment on the pleadings and denying DuPont's motion for judgment under Federal Rule of Civil Procedure 54(b) and its request for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This order rested on an earlier opinion and order, entered on December 30, 2003, granting the Government summary judgment in a "test case" brought to determine whether DuPont had a cause of action against the Government for contribution under CERCLA.[12] DuPont asserts

in that they both allow private parties to recoup costs from other private parties[, b]ut the two remedies are clearly distinct." Cooper Indus., 543 U.S. at 163 n.3.

[11] Because DuPont was the only plaintiff at issue in the "test case" litigated before the District Court, we refer to the parties in most instances as "DuPont." Insofar as the identity of parties other than DuPont is relevant, we refer to the parties as "appellants."

[12] The District Court's December 30, 2003 order was superseded by an amended order on January 8, 2004. For purposes of this appeal, the orders are substantively identical.

23

the District Court erred in its statutory analysis, that an implied cause of action exists under federal common law, and that the District Court mistakenly dismissed all claims (and not just the test case) on the pleadings.

### A.    Background

This case concerns fifteen facilities owned by appellants in several states, including New Jersey.[13]  Each of the sites is contaminated with hazardous waste, and was owned or operated by the United States at various times during World War I, World War II, and/or the Korean War, during which time the United States was responsible for some contamination.

Appellants brought an action against the United States in January 1997 (before the Supreme Court's decision in Cooper Industries) seeking contribution from the Government toward the costs of cleanup at the sites.  Initially, the complaint alleged causes of action under CERCLA § 107(a) (cost recovery) and

---

[13]  The facilities include DuPont sites in Pompton Lakes, New Jersey; Newark, New Jersey; Parlin, New Jersey; Carneys Point, New Jersey; Gibbstown, New Jersey; Buffalo, New York; Niagara, New York; Niagara Falls, New York; East Chicago, Indiana; Louisville, Kentucky; Nashville, Tennessee; Spruance, Virginia; and Belle, West Virginia; a ConocoPhillips site in Ponca City, Oklahoma; and a Sporting Goods Properties site in Bridgeport, Connecticut.

24

§ 113(f)(1) (contribution).[14] We decided New Castle County and Reading in May and June 1997, respectively; in keeping with those holdings, appellants' § 107(a) claim was voluntarily dismissed without prejudice. See E.I. DuPont de Nemours & Co. v. United States, 297 F. Supp. 2d 740, 742-43 (D.N.J. 2003). The District Court thereafter designated one of the facilities named in the complaint — the DuPont facility in Louisville, Kentucky — as a "test case" to determine whether DuPont (which had voluntarily undertaken to clean up the site without a preexisting § 106 or § 107 action or a § 113(f)(3) settlement) could seek contribution from other PRPs under § 113(f)(1). Full discovery was had regarding the claims related to the Louisville facility, and the Government moved for summary judgment under Federal Rule of Civil Procedure 56 on the ground that, as a PRP that had voluntarily incurred its cleanup costs without having been sued or settled its liability, DuPont had no cause of action for contribution under § 113.

### B.    First District Court Decision

On December 30, 2003, the District Court issued a lengthy opinion and order granting the Government's motion for

---

[14] The complaint also included a separate count seeking "recoupment" of costs, but did not provide any statutory basis for this claim. This count was voluntarily dismissed in December 1997. See E.I. DuPont de Nemours & Co. v. United States, 297 F. Supp. 2d 740, 743 (D.N.J. 2003).

25

summary judgment with respect to the Louisville facility. See E.I. DuPont, 297 F. Supp. 2d 740. The Court concluded that a PRP, like DuPont, could only bring a contribution action in three circumstances: (1) during or following a civil action against the PRP under §106 or § 107 (as set forth in § 113(f)(1)); (2) after the PRP entered into a judicially or administratively approved settlement of its liability (as set forth in § 113(f)(3)(B)); or (3) as suggested by the "saving clause," in some other undefined contribution action. Id. at 747. Since DuPont had not been sued under § 106 or § 107, and had not settled its liability with respect to the Louisville facility, the Court considered whether it could pursue some other contribution action.

It noted that the saving clause should not be read to allow a contribution action, regardless of its source (such as "some other (federal or state) statute," id. at 750), unless the plaintiff satisfied the "requirements of a traditional, common law contribution action." Id. at 751; see also Reading, 115 F.3d at 1124 (noting that the term "contribution" in CERCLA is used "in its traditional, common law sense"). Such an action "'exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability.'" E.I. DuPont, 297 F. Supp. 2d at 746 (quoting Restatement (Second) of Torts § 886A(2)) (emphases in original). Moreover, the District Court concluded that "a contribution action requires (at least) a prior or ongoing lawsuit," id. at 749 (emphasis in original), and DuPont's claim regarding the Louisville facility did not meet these criteria.

26

The Court concluded that "the purpose of the so-called saving clause [in § 113(f)(1)] was to clarify that a contribution action brought following a settlement under the aegis of Section 113(f)(3) should not be held to be procedurally insufficient because of an absence of a prior primary action brought pursuant to CERCLA Sections 106 or 107." Id. at 754 (emphasis omitted).[15] It granted the Government's motion for summary judgment on this basis.[16]

---

[15] The Court noted the possibility that the saving clause was intended to preserve causes of action for contribution arising from non-§ 113 CERCLA provisions without a prior settlement or suit, but concluded that, under this Court's decision in Reading that § 113 displaced all pre-SARA common law or implied rights of action for contribution under sections other than § 113, such an interpretation was not persuasive. E.I. DuPont, 297 F. Supp. 2d at 750.

[16] The Court admitted that its holding would "limit the ability of some PRPs to recoup cleanup costs from other PRPs," and that this "might very well hamper some PRP efforts at removal and remediation of hazard[ous] waste sites." E.I. DuPont, 297 F. Supp. 2d at 754. Indeed, the Court noted that if "the statute were ambiguous or if the Court believed that the meaning of the term 'contribution' were unsettled when Congress wrote the SARA amendments, then [it] would of necessity turn to the general purposes of the statute to determine the reach of the provision." Id. at 754-55. But the Court concluded that "the statute's terms appear reasonably clear," and thus any effort to allow contribution in the absence of a prior suit or settlement

27

## C.     Second District Court Decision

On March 1, 2004, the District Court issued another opinion and order granting the Government judgment on the pleadings under Federal Rule of Civil Procedure 12(c) with respect to the other fourteen sites mentioned in appellants' complaint, and denying appellants' request for judgment under Federal Rule of Civil Procedure 54(b) or certification of an interlocutory appeal from the Court's prior order.  The Court noted that, although appellants' lawyers represented they "'could amend the Complaint to potentially comply'" with the Court's earlier opinion — by, for example, showing that they incurred cleanup costs at some of the sites pursuant to EPA orders or consent decrees — "[a] party's lawyer's representation is not evidence[, and] this representation [does not] appear in the pleadings."  E.I. DuPont de Nemours & Co. v. United States, No. 97-497, slip op. at 5 n.4 (D.N.J. March 1, 2004).  Indeed, the Court noted,

> [the] Complaint and the competent evidence before this Court do not establish or tend to establish that the fourteen remaining sites (unaffected by this Court's prior amended order) are in any material

"would be rewriting the statute, [which] is not the Court's role." Id. at 755.

28

sense distinguishable from the Louisville site. Prior to and during briefing of the Government's current motion, Plaintiffs failed to produce any (record) evidence, in the form of affidavits, certifications, copies of agreements settling CERCLA claims, or records of prior judicial or administrative CERCLA § 106 orders or CERCLA § 107 proceedings. Even at oral argument, Plaintiffs did not seek leave to amend their Complaint or permission to make a late filing. Simply put, at this juncture, there is nothing in the record before this Court establishing or tending to establish with regard to any of the remaining sites that any Plaintiff (in the instant action) either has settled a CERCLA § 113(f)(3) claim or has been named a defendant in a (prior or on-going) CERCLA §106 or CERCLA § 107 action.

Id. at 4-5 (emphasis in original) (footnote omitted).

29

The District Court thus concluded that the pleadings did not suggest any basis on which it could reach a conclusion with respect to the fourteen other sites different from its conclusion with respect to the Louisville site, and therefore granted the Government judgment on the pleadings for all sites.

### D.    Appeal

DuPont and the other plaintiffs appealed, and we stayed briefing pending the Supreme Court's decision in Cooper Industries. As noted, the Supreme Court's decision confirmed the District Court's conclusion that contribution under § 113 is available to a PRP only if it settles its liability or is subject to a civil action under § 106 or § 107.

In light of Cooper Industries, DuPont raises four issues on appeal and makes the following arguments. First, it contends that § 107 expressly provides PRPs a cause of action to seek contribution from other PRPs independent of the remedy provided by § 113. Second, it asserts alternatively that such a cause of action is implied in § 107 or arises from federal common law. Third, it argues that the District Court erred in applying a multi-part test for contribution claims that is inconsistent with our Court's precedent. Fourth, it contends the District Court erred in granting the Government judgment on the pleadings with respect to the non-Louisville sites. For the

30

reasons stated below, the District Court's December 30, 2003 order (as amended on January 8, 2004) is affirmed, and its March 1, 2004 order is also affirmed, with one exception that will be explained below.

## III. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction over this case under 28 U.S.C. § 1331, and we have jurisdiction on appeal under 28 U.S.C. § 1291. We exercise plenary review of a district court's grant of summary judgment and judgment on the pleadings. See Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 219-20 (3d Cir. 2005). In conducting this review, all facts and inferences are construed in the light most favorable to the non-moving party, and "[j]udgment will not be granted unless the movant clearly establishes there are no material issues of fact, and he is entitled to judgment as a matter of law." Id. at 220. Our review of questions of statutory interpretation is also plenary. United States v. E.I. DuPont de Nemours & Co., Inc., 432 F.3d 161, 164 (3d Cir. 2005) (en banc).

## IV. Availability of Contribution

Although DuPont would undoubtedly prefer that we write our decision on a blank slate in deciding whether it may seek contribution under § 107(a), we cannot do so. Rather, we must decide if our prior decisions in New Castle County and Reading control this case or are distinguishable. If they control, we must

31

then decide whether our panel may decline to follow those precedents "in light of intervening authority even without en banc consideration." George Harms Constr. Co. v. Chao, 371 F.3d 156, 161 (3d Cir. 2004). As we explain below, we hold that New Castle County and Reading control the outcome of this case, and no intervening authority provides a basis sufficient to reconsider those precedents.[17]

---

[17] The Government contends that, because none of the appellants pursued express or implied causes of action for contribution under § 107(a) or federal common law in the District Court, these claims are waived on appeal. Appellants did, however, seek the relief they believed available to them under this Court's precedents. Since Cooper Industries had not been decided at the time final judgment was rendered by the District Court, there was no reason appellants should have thought it potentially useful to pursue a remedy under § 107(a) — that remedy was foreclosed by Reading, and the view at the time was that they had a cause of action under § 113. Regardless of whether their arguments regarding a cause of action under § 107(a) are ultimately persuasive, it is clear to us that Cooper Industries raised legal questions DuPont had no reason to ask before that decision. We will therefore exercise our discretion to consider DuPont's arguments on the merits. See Salvation Army v. Dep't of Cmty. Affairs of N.J., 919 F.2d 183, 196 (3d Cir. 1990) ("Where, as here, a previously ignored legal theory takes on new importance due to an intervening development in the law, it is appropriate for us to exercise our discretion to allow a party to revive that theory.").

32

**A.** **Applicability of New Castle County and Reading**

To repeat, New Castle County and Reading stand jointly for the proposition that a PRP seeking to offset its cleanup costs must invoke contribution under § 113; the express cause of action under § 107 (cost recovery) is limited to governments and Indian tribes (acting in their enforcement capacity) and innocent landowners, and no implied cause of action for contribution for PRPs — under either § 107 or the common law — survived the passage of § 113. This rule, unless factually distinguishable, controls the case before us.

Recently, the United States Court of Appeals for the Second Circuit decided Consolidated Edison Co. of New York v. UGI Utilities, Inc., 423 F.3d 90 (2d Cir. 2005), which held that, despite a prior Second Circuit decision suggesting the contrary, a PRP has an implied cause of action for contribution under § 107. See id. at 100 & n.11 (concluding that "section 107(a) permits a [PRP] that has not been sued or made to participate in an administrative proceeding . . . to recover necessary response costs incurred voluntarily," which the Court deemed "consistent with the view that courts took of section 107(a) before section 113(f)(1) was enacted"). The Second Circuit admitted that its earlier holding in Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir. 1998) — which is substantively similar to our holdings in New Castle County and Reading — was inconsistent with this approach. Nonetheless, the panel

33

"decline[d] to answer the question whether a three-judge panel of this court may depart from <u>Bedford Affiliates</u>'s . . . holding." <u>Consol. Edison</u>, 423 F.3d at 101 n.12. It noted that, as in <u>New Castle County</u> and <u>Reading</u> (but unlike in <u>Consolidated Edison</u> or this case), the plaintiff in <u>Bedford Affiliates</u> cleaned up its site pursuant to a consent order and sought relief under both § 107 and § 113.

Thus, the Court limited <u>Bedford Affiliates</u> "to hold that a party that has incurred or is incurring expenditures under a consent order with a government agency and has been found partially liable [for contribution] under § 113(f)(1) may not seek to recoup those expenditures under section 107(a)." <u>Id.</u> at 102. The Court concluded that its holding in <u>Consolidated Edison</u> — "that a party that has <u>not</u> been sued or made to participate in an administrative proceeding, but, <u>if</u> sued, would . . . be liable under section 107(a), may still recover necessary response costs incurred voluntarily" — did not conflict with its understanding of <u>Bedford Affiliates</u>. <u>Id.</u> (emphases added).[18]

---

[18] Shortly before we filed this opinion, the United States Court of Appeals for the Eighth Circuit decided <u>Atlantic Research Corp. v. United States</u>, __ F.3d __, 2006 WL 2321185 (8th Cir. Aug. 11, 2006), in which it reached the same result as the Second Circuit in <u>Consolidated Edison</u>. We note that <u>Atlantic Research</u> relies almost entirely on the reasoning of <u>Consolidated Edison</u>, and thus our consideration of the Second Circuit's case applies as well to the decision of the Eighth

34

DuPont would have us adopt this reasoning to distinguish New Castle County and Reading. It argues that, as in Bedford Affiliates, both of our prior cases involved PRPs that cleaned up sites pursuant to some form of EPA oversight.[19] Tracking the analysis in Consolidated Edison, DuPont asserts that New Castle County and Reading are fundamentally different from this case (where appellants cleaned up their sites voluntarily), because the rule in our prior cases may be limited factually to those circumstances where a PRP has already satisfied the prerequisites for § 113 contribution set forth in Cooper Industries.

---

Circuit.

One important difference between the two cases is that in Atlantic Research (as here) the United States was a party. The Eighth Circuit based its decision, in part, on its conclusion that denying a PRP that voluntarily cleans up a site contribution from the Government would allow the Government to "insulate itself from responsibility for its own pollution by simply declining to bring a CERCLA cleanup action or refusing a liable party's offer to settle." Atlantic Research, 2006 WL 2321185, at *8. As we explain in footnote 31 below, however, we are underwhelmed by this argument.

[19]  As noted, the New Castle County plaintiffs incurred response costs pursuant to an EPA consent decree, see 111 F.3d at 1119, and the Reading plaintiff cleaned up its site pursuant to a § 106 order and § 107 suit, see 115 F.3d at 1116.

We disagree. Although we will not dispute the Second Circuit's interpretation of its precedent, we do not read our precedents to be so limited. Nothing in New Castle County and Reading suggests that our holdings in those cases depended on the motivations for the cleanups. Indeed, we reached the § 107 and common law claims in those cases precisely because § 113 was not sufficient to dispose of the appeals. In New Castle County, for example, we noted that the circumstances of that case forced us to decide whether a PRP may seek cost recovery under § 107 (even if it would ordinarily qualify for contribution under § 113) because the respective statutes of limitations for the different types of claims meant that, on the facts of the case, a § 107 cost recovery action would have been timely but a § 113 contribution action would not. 111 F.3d at 1120. And in Reading, we necessarily considered whether any contribution claim (common law, implied in § 107, or express in § 113) could survive the discharge of a PRP's liability to the United States in a bankruptcy proceeding. We concluded that an express § 113 contribution claim was precluded by the fact that the Government's claim against the PRP was discharged by the PRP's bankruptcy, meaning there was no underlying action and thus other PRPs could not seek contribution from the debtor. Reading, 115 F.3d at 1126. We rejected the common law and implied cause of action claims because they were categorically precluded by the statute. Id. at 1117, 1120-21.

It is familiar law that when the rule in a prior case by its terms controls the outcome of a current case, we will not reach

36

out to distinguish the prior case on the basis of factual differences that were not "material" to the earlier holding. As Judge Kozinski explained in Hart v. Massanari, 266 F.3d 1155 (9th Cir. 2001), common law precepts require that "a court confronted with apparently controlling authority must parse the precedent in light of the facts presented and the rule announced. Insofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis." Id. at 1172; see also United States v. Rosero, 42 F.3d 166, 174 n.16 (3d Cir. 1994) (refusing the defendants' invitation to distinguish an earlier case because the precedent was not "materially distinguishable" from the facts at hand); Black's Law Dictionary 629 (8th ed. 2004) (defining a "material fact" as one "that is significant or essential to the issue or matter at hand"). Our holdings in New Castle County and Reading — based on our interpretation of the statute — are broad, and nothing in those cases suggests that the results would have been different if the plaintiffs had undertaken voluntary cleanups.[20]  We do not,

---

[20] At least one commentator has suggested that courts "do not concede to their predecessors the power of laying down very wide rules; they reserve to themselves the power to narrow such rules by introducing into them particular facts of the precedent case that were treated by the earlier courts as irrelevant." John Salmond, Jurisprudence 192 (10th ed. 1947), reprinted in Black's Law Dictionary 507 (8th ed. 2004).  While this may be

37

true as a general proposition, it cannot serve as a rule of decision in a case such as this. First, even if a panel treated certain facts as "irrelevant" in a prior opinion, they must still be material to the earlier holding to serve as a basis for distinguishing the case, as our discussion above demonstrates. Second, and perhaps more importantly, our interpretation of CERCLA's requirements in New Castle County and Reading established that the plaintiffs in those cases lost not because they had been compelled to clean up their sites and hence qualified for contribution under § 113 (indeed, as explained, neither plaintiff could in fact seek § 113 contribution on the facts of those cases), but because their complaints alleged causes of action under § 107 or the common law that were not authorized by the statute for any PRP. Of course, our Court might still have ruled against the plaintiffs by interpreting CERCLA differently, but that is not the interpretation we deemed appropriate based on the terms of the statute.

Particularly in the statutory interpretation realm, where courts must faithfully apply Congress' words and determine their settled meaning, the breadth of a court's holding is often compelled by the scope of Congress' prescription. We therefore reject the argument that our holdings in New Castle County and Reading (that CERCLA precludes PRPs from seeking cost recovery or contribution under § 107, and establishes § 113 as the sole basis on which a PRP may equitably apportion its costs through contribution) are broader than they needed to be on the facts of those cases. To the contrary, those rules apply directly to this case, and may not be distinguished based on facts that were not material to the earlier decision, especially since the

38

therefore, believe our precedents may be distinguished from this case as the Second Circuit distinguished <u>Bedford Affiliates</u> from the circumstances of <u>Consolidated Edison</u>.

**B.**        **Continued Viability of <u>New Castle County</u> and <u>Reading</u> After <u>Cooper Industries</u>**

We turn, then, to the question of whether we may nonetheless reconsider our precedents in light of intervening authority. In doing so, we are mindful of the Supreme Court's admonition that when "dealing with an issue of statutory interpretation, . . . the claim to adhere to case law is generally powerful once a decision has settled statutory meaning." <u>Shepard v. United States</u>, 544 U.S. 13, 23 (2005); <u>see also</u> <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 172-73 (1989) ("[T]he burden borne by the party advocating the abandonment of an established precedent is greater where the Court is asked to overrule a point of statutory construction. Considerations of <u>stare decisis</u> have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done.").

Because the statute itself has not changed, DuPont focuses its attention on <u>Cooper Industries</u>. Its arguments may be distilled to two intersecting theories. First, it argues that <u>Cooper</u>

---

terms of the statute have not changed.

39

*Industries* undercut a supposed major premise of our holding in *Reading* — namely, that a PRP could seek contribution from another PRP without having been sued or settled its liability. Thus, DuPont contends that the analytical foundation of *Reading* was overruled by the Supreme Court and we may, therefore, disregard our prior decision. Second, it contends that *Cooper Industries* changed settled expectations in the cost apportionment field to such a dramatic extent that the rules set out in *New Castle County* and *Reading* no longer serve the purposes of CERCLA. As such, DuPont argues, the intervening authority of *Cooper Industries*, when viewed in the light of CERCLA's legislative history, provides a basis for us to find an express or implied cause of action for contribution under § 107 or the common law notwithstanding our precedent.

1. Alleged Inconsistency Between Cooper Industries and Reading

a. Facial Inconsistency

*Cooper Industries* did not explicitly or implicitly overrule our precedents; indeed, the Supreme Court expressly declined to consider the very questions at issue here. See *Cooper Indus.*, 543 U.S. at 168-71. Though it is true that our observation in *Reading* that "§ 113(f)(1) specifically permits an action for contribution to be brought 'in the absence of a civil action under . . . section [107],'" 115 F.3d at 1120, cannot support a cause of action for PRPs engaged in voluntary cleanups after *Cooper*

40

Industries, we reject DuPont's view that this fatally undermines Reading's holding. For one thing (as explained in Part IV.B.1.b below), our statement in Reading did not necessarily endorse a § 113(f)(1) contribution action in the absence of a preexisting civil action (and is not, therefore, clearly at odds with the Supreme Court's later instructions). But insofar as our statement can be read to recognize implicitly that possibility, it merely "reenforce[d] our conclusion that Congress intended § 113 to be the sole means for seeking contribution." Id. (emphasis added). We also relied on our precedent in New Castle County, the holdings of other Courts of Appeals, rules of statutory construction, and CERCLA's purpose following the SARA amendments, in deciding that § 113 provides the only contribution remedy under CERCLA. We conclude that, even disregarding the possible implicit reference in Reading to a § 113(f)(1) contribution action in the absence of a § 107 suit, our holding in that case was amply supported on other grounds and therefore survives Cooper Industries.

b.      Saving Clause

It is true that Reading's statement — which quotes from § 113(f)(1)'s saving clause — could be read to endorse a contribution action under § 113(f)(1) without a preexisting civil action, and as such would be wrong. See Cooper Indus., 543 U.S. at 167 (explaining that the saving clause "does [not] . . . expand § 113(f)(1) to authorize contribution actions not brought 'during or following' a § 106 or § 107(a) civil action"). But the

41

Supreme Court also observed that while the saving clause "rebuts any presumption that the express right of contribution provided by the enabling clause [in §113(f)(1)] is the exclusive cause of action available to a PRP," it does not "specify what causes of action for contribution, if any, exist outside § 113(f)(1)," and the Court did not itself address the question further. Id. at 166-67.

We do know, however, there is one express cause of action available to a PRP for contribution under CERCLA outside the strictures of § 113(f)(1): contribution under § 113(f)(3)(B) for PRPs that settle their liability "in an administrative or judicially approved settlement." Our statement in Reading is not, therefore, necessarily incorrect: it is true that § 113(f)(1) does not foreclose contribution actions when the PRP has not been sued, because § 113(f)(3)(B) remains available if the party chooses to settle. As we explain below, SARA's legislative history makes clear that the § 113(f)(3)(B) settlement provision is one of two incentives that are crucial to a carefully considered scheme to encourage PRPs to settle their liability, enter into consent decrees, and perform supervised cleanups.[21] The District Court concluded that the § 113(f)(1) saving clause merely clarifies that "a contribution action brought following a settlement under the aegis of Section 113(f)(3) should not be held to be procedurally insufficient because of an

---

[21] The other incentive is the contribution protection for settling PRPs provided under § 113(f)(2).

42

absence of a prior primary action pursuant to CERCLA Sections 106 or 107." E.I. DuPont, 297 F. Supp. 2d at 754 (emphasis omitted). As the discussion below demonstrates, this interpretation is consistent with the settlement provisions in SARA, and though there is no legislative history regarding the meaning of the saving clause, we are confident that the District Court's interpretation is in accord with CERCLA's purpose (as amended by SARA), as is our decision in Reading. We therefore decline DuPont's invitation to revisit Reading solely because its possible interpretation of the saving clause is incorrect, especially since our statement in Reading is not necessarily inconsistent with Cooper Industries in the first place.

## 2.   Statutory Purpose

DuPont's argument regarding the purpose of CERCLA merits more discussion. To repeat, DuPont contends that, in the wake of Cooper Industries, our decisions in New Castle County and Reading are in direct opposition to CERCLA's broad remedial purpose as expressed in its legislative history. This, it urges, makes necessary an implied cause of action for contribution, available to PRPs that voluntarily clean up contaminated sites, to fill the gaps Cooper Industries recognized in Congress' remedial scheme. Indeed, as one Court has noted, the "combined result" of Cooper Industries and cases like New Castle County and Reading is "quixotic": "the present statutory arrangement resulting from the combined authority of [Cooper Industries and earlier Courts of Appeals cases] compels a

43

responsible party engaged in voluntary remediation to foot the bill for other parties, which will have the effect of encouraging responsible parties to rest on their heels and wait for the instigation of adverse proceedings, rather than implement a cost-effective environmental contamination response strategy." Mercury Mall Assocs., Inc. v. Nick's Market, Inc., 368 F. Supp. 2d 513, 519 (E.D. Va. 2005) (internal quotation marks and alterations omitted).

As amici American Chemistry Council and Superfund Settlements Project assert, allowing only sued or settling PRPs to seek contribution "would discourage and delay the very cleanups that Congress sought to encourage and accelerate" by enacting CERCLA. Amici Br. at 9. Indeed, amici assert that the EPA has long encouraged PRPs to clean up contaminated sites voluntarily, and for those who do (amici estimate around 70% of all cleanups), the EPA has stated that it is "'important to . . . remove unnecessary obstacles to their ability to recover their costs from the parties that are liable for the contamination.'" Id. at 7-8 (quoting National Oil and Hazardous Substance Contingency Plan, 55 Fed. Reg. 8666, 8792-93 (March 8, 1990)).[22] If PRPs engaged in voluntary cleanups may not seek contribution, DuPont and amici argue, "companies would resist

_____

[22] As we explain in footnote 30 below, however, this statement is taken out of context. In context, it is clear the EPA refers to cost recovery actions — which, as we noted in New Castle County, are available only to innocent parties, not PRPs.

44

undertaking new cleanup obligations, and would rarely do so voluntarily," thus frustrating core purposes of CERCLA. Id. at 9.

### a. CERCLA's Legislative History

We begin, then, with the legislative history of CERCLA.[23] Although the statute is supposed to be "comprehensive," the legislative history is not, as many of the pre-SARA cases that allowed an implied right of action under

---

[23] We are mindful, of course, that legislative history can sometimes be "murky, ambiguous, and contradictory," and that recourse to it as an interpretive aid may, if we are not careful, devolve to "an exercise in looking over a crowd and picking out your friends." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. __, 125 S. Ct. 2611, 2626 (2005) (internal quotation marks omitted). We are confident that these concerns are not implicated here. Though (as explained below) the legislative history of CERCLA is rather unclear, particularly with respect to voluntary cleanups by PRPs, the legislative history of SARA uniformly indicates the intent of Congress to encourage settlement by, inter alia, authorizing an express and limited contribution right. We also observe that, although we would of course have no need to look to the legislative history to discern the meaning of an unambiguous statutory provision, see Cooper Indus., 543 U.S. at 167, we need to consult the legislative history where, as here, a party urges us to disregard precedent and imply a cause of action to effect the intent of Congress.

§ 107 observed. See, e.g., Walls, 761 F.2d at 318 ("[T]he legislative history of CERCLA is vague, reflecting the compromise nature of the legislation eventually enacted."); NCC, 642 F. Supp. at 1263 (noting "the absence of significant legislative history" of CERCLA); see also Frank P. Grad, A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980, 8 Colum. J. Envtl. L. 1, 2 (1982) ("In the instance of the 'Superfund' legislation, a hastily assembled bill and a fragmented legislative history add to the usual difficulty of discerning the full meaning of the law.").

Though without doubt CERCLA's drafters intended that the statute encourage responsible parties to clean up hazardous waste sites and bear the costs of doing so, see Morton Int'l, 343 F.3d at 676, Congress' position on voluntary cleanups is less clear. Reporting on the proposed Hazardous Waste Containment Act (the House of Representatives' version of CERCLA, see Grad, supra, at 4-5),[24] the House Committee on Interstate and Foreign Commerce noted that the bill would "establish a Federal cause of action in strict liability to enable the [EPA] administrator to pursue rapid recovery of the costs incurred for the costs of such [cleanup] actions undertaken by him from persons liable therefor and to induce such persons

---

[24] For a thorough review of the legislative debates on the House and Senate versions of CERCLA, and the compromises that allowed the legislation to become law, see Grad, supra.

46

voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites." H.R. Rep. No. 96-1016(I), at 17 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6120. Representative Florio, the floor manager of the legislation in the House, noted that "[t]he strong liability provisions that are in our bill . . . are very important, because we want to induce those who know where these sites are to remedy the sites themselves. If there is no liability provision, they will not have any incentive whatsoever to go forward on a voluntary basis and clean up those sites." 126 Cong. Rec. H9441 (daily ed. Sept. 23, 1980); see also id. at H9467 (statement of Rep. Florio) ("EPA is required not to act if the responsible party or parties will take appropriate action to clean[ ]up and contain these sites.").

These statements do not, however, establish that Congress necessarily intended that PRPs engaged in voluntary cleanups be able to seek contribution; they could just as easily reflect congressional recognition that a strong enforcement scheme holding wrongdoers liable would encourage PRPs to head off potentially ruinous litigation or punitive settlements and clean up their own mess.[25] Indeed, Congress provided no

---

[25] Indeed, the companion legislation in the Senate focused more on deterrence than on encouraging voluntary cleanups. See S. Rep. No. 96-848, at 13, 15 (1980) (noting that the bill's intent was that "those responsible for any damage, environmental harm, or injury from chemical poisons bear the

express right of contribution for any PRP that incurred response costs, whether voluntarily or not. Language providing an express cause of action for contribution among PRPs was rejected by Congress, see NCC, 642 F. Supp. at 1263, as was language providing for joint and several liability, see, e.g., 126 Cong. Rec. S14,964 (daily ed. Nov. 24, 1980) (statement of Sen. Randolph) ("It is intended that issues of liability not resolved by this act, if any, shall be governed by traditional and evolving principles of common law. An example is joint and several liability. Any reference to these terms has been deleted, and the liability of joint tort feasors will be determined under common or previous statutory law."); 126 Cong. Rec. H11,787 (daily ed. Dec. 3, 1980) (statement of Rep. Florio) (same).

While it is clear that CERCLA's drafters intended common law principles to govern liability, we have not found evidence in the legislative history that Congress contemplated this would extend a contribution right to PRPs engaged in entirely voluntary cleanups. In fact, the House and Senate floor managers' statements that liability would be governed by common law principles appear inconsistent with this possibility, since contribution among jointly and severally liable tortfeasors ordinarily follows a determination of liability to a common plaintiff who suffered an injury. See, e.g., Restatement

costs of their actions" on the basis of "strict, joint, and several liability" to create an "incentive for greater care focus[ed] on the initial generators of hazardous wastes").

48

(Second) of Torts §§ 875, 886A (1979); 2 Michael Dore, <u>Law of Toxic Torts</u> § 16.04 (1999) ("In general, contribution is available whenever a party is held liable to a plaintiff for injuries [for] which other parties were at least partially responsible."); <u>see also</u> <u>Northwest Airlines</u>, 451 U.S. at 86-88 (noting that, in "most American jurisdictions, . . . a right to contribution is recognized when two or more persons are liable to the same plaintiff for the same injury and one of the joint tortfeasors has paid more than his fair share of the common liability"). As then-Representative Gore explained to the House of Representatives in offering an amendment to the Hazardous Waste Containment Act,

> Joint and several liability ordinarily would mean that whenever a single, indivisible harm is sustained as a result of independent, separate, but concurring tortious acts by two or more actors, each can be held liable for the entire amount of damages incurred. . . . The plaintiff could collect the total sum of damages awarded from a single defendant and could avoid the agony of multiple suits against the defendants that would otherwise be necessary to achieve full compensation.

49

Under the theory of contribution, the defendant from whom the plaintiff receives payment may then collect from the other defendants for that part of the damages for which each is responsible. . . . [C]ourts [have] concluded that because the defendants were the ones at fault, it would be unfair to place the burden of demonstrating the apportionability of the damage on the plaintiff. The burden was thus placed on the defendants to work out for themselves who was responsible for what part of the injury under the process of contribution [after the plaintiff recovered his damages].

126 Cong. Rec. H9463 (daily ed. Sept. 23, 1980).

b.      SARA's Legislative History

The legislative history of the SARA amendments, while labyrinthine, is less clouded than the legislative history of CERCLA as initially enacted, particularly with respect to contribution and voluntary cleanups. Cooper Industries puts

50

beyond question that § 113 establishes a contribution remedy only for PRPs that have settled their liability or have been sued, and the legislative history supports this reading. See, e.g., S. Rep. No. 99-11, at 44 (1985) (stating that § 113 "clarifies and confirms the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties"); H.R. Rep. No. 99-253(I), at 79 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2861 (same); H.R. Rep. No. 99-253(III), at 18 (1986), reprinted in 1986 U.S.C.C.A.N. 3038, 3041 (stating that § 113 "clarifies and emphasizes that persons who settle with EPA (and who are therefore not sued), as well as defendants in CERCLA actions, have a right to seek contribution from other potentially responsible parties").

SARA's legislative history also reveals an express bent toward encouraging settlement. See, e.g., H.R. Rep. No. 99-253(III), at 29, reprinted in 1986 U.S.C.C.A.N., at 3052 ("The Judiciary Committee strongly agrees with the Energy and Commerce Committee that encouraging . . . negotiated clean-ups will accelerate the rate of clean-ups and reduce their expense by making maximum use of private sector resources. The Committee also agrees that this emphasis on negotiated clean-ups should not replace or diminish a strong and aggressive enforcement policy, but rather should complement such a policy."); H.R. Rep. No. 99-253(I), at 100-01, reprinted in 1986 U.S.C.C.A.N., at 2882-83 (same). As the Senate Environment and Public Works Committee reported, voluntary cleanups, though desirable, should be undertaken pursuant to a settlement

51

with the EPA:

Congress, the EPA, responsible parties, and other critics have suggested several means of speeding up and economizing on site cleanups. These include enlarging the Superfund, setting program deadlines, expanding the EPA program offices, empowering citizens to sue, and encouraging voluntary cleanup by industry. Although enlarging the Fund, providing more staff, and setting program deadlines would tend to accelerate the CERCLA effort, the Administrative Conference believes that a properly designed site cleanup negotiation process, through which responsible parties or third parties would agree to act directly to clean up sites, would also hasten cleanup while reducing its expense by tapping the technical and financial resources of the private sector. Involvement of the federal government and affected citizens in this process would

52

ensure adequate protection of public health and the environment.

. . .

The final agreement should take the form of an administrative consent order under section 106 of CERCLA or a judicial consent decree.

S. Rep. No. 99-11, at 65, 67; see also H.R. Rep. No. 99-253(V), at 58 (1986), reprinted in 1986 U.S.C.C.A.N. 3124, 3181 ("The Committee recognizes that Fund-financed cleanups, administrative action and litigation — even under a strong and vigorous enforcement program — will not be sufficient to accomplish CERCLA's goals. Voluntary cleanups are essential to a successful program for cleanup of the Nation's hazardous substance pollution problem.  [SARA's settlement provisions are] intended to encourage and establish procedures and protections pertaining to negotiated private party cleanup of hazardous substances where such cleanup is in the public interest." (emphasis added)); 132 Cong. Rec. H9609 (statement of Rep. Slattery) ("This legislation . . . encourages potentially responsible parties to come out of the woodwork and the courts, and settle on an environmentally acceptable cleanup plan.").

It is also apparent from the legislative history that Congress intended the contribution allowed by § 113 to be a crucial part of its scheme to encourage settlement and (by extension) private cleanups by PRPs within the bounds of the settlement agreements. The House Energy and Commerce Committee, for example, reported that limiting contribution to parties who were sued or settled

> should encourage private party settlements and cleanups. Parties who settle for all or part of a cleanup or its costs, or who pay judgments as a result of litigation, can attempt to recover some portion of their expenses and obligations in contribution litigation from parties who were not sued in the enforcement action or who were not parties to the settlement. [Such] parties may be more willing to assume the financial responsibility for some or all of the cleanup [i.e., through settlement] if they are assured that they can seek contribution from others.

H.R. Rep. No. 99-253(I), at 80, reprinted in 1986 U.S.C.C.A.N., at 2862; S. Rep. No. 99-11, at 44 (same).

The settlement procedures now set forth are expected to be a significant inducement for parties to come forth, to settle, to avoid wasteful litigation and thus to begin cleanup.

. . .

The bill would give potentially responsible parties the explicit right to sue other liable or potentially liable parties who also may be responsible for the hazardous waste site. [Also,] [i]f a party has resolved its liability to the U.S. or a state in a judicially[ ] approved, good-faith settlement, the party would not be liable for claims for contribution or indemnity on matters addressed in the settlement. These provisions should encourage quicker, more equitable settlements, decrease litigation and thus facilitate cleanups.

H.R. Rep. No. 99-253(I), at 58-59, reprinted in 1986

55

U.S.C.C.A.N., at 2840-41 (emphasis added); see also H.R. Rep. No. 99-253(III), at 20, reprinted in 1986 U.S.C.C.A.N., at 3043 (explaining that "[the] amendments to the contribution section [i.e., § 113] will improve its effectiveness, ensure its fair operation, and encourage settlements by responsible parties"). As Senator Stafford, the floor manager of SARA in the Senate, explained, the legislation recognized that settlements are a crucial part of the EPA's enforcement regime, and "[t]he theory underlying Superfund's liability scheme was, and is, that the Government should obtain the full costs of cleanup from those it targets for enforcement, and leave remaining costs to be recovered in private contribution actions between settling and nonsettling parties." 132 Cong. Rec. S14,903 (daily ed. Oct. 3, 1986).

\* \* \* \* \*

Congress no doubt intended by the SARA amendments to encourage settlements, and further intended that the promise of contribution for settling wrongdoers would encourage them to come forward, negotiate a settlement with the Government, and begin work on supervised cleanups. Indeed, the "voluntary" nature of the cleanups Congress had in mind was a voluntary agreement to settle and enter into a consent decree, rather than a wholly voluntary, unsupervised, sua sponte cleanup operation. CERCLA's initial legislative history — which is sparse, vague with respect to voluntary cleanups, and leaves issues of joint and several liability (including contribution) to the common law —

56

must, of necessity, be read in tandem with SARA, and SARA establishes a specific and intricate legislative scheme for encouraging settlement through, among other things, a limited contribution right.

> c.      Contribution      for      Voluntary Cleanups without Settlement or Suit

To be sure, the legislative history of SARA contains no express statement that parties that clean up their own sites voluntarily, without having settled their liability or having been sued, cannot seek contribution.[26]  We conclude, however, that SARA's settlement scheme is inconsistent with such a right.

First, we are mindful of the Supreme Court's caution that "once Congress addresses a subject, even a subject previously governed by federal common law, the justification for lawmaking by the federal courts is greatly diminished. Thereafter, the task of the federal courts is to interpret and apply statutory law, not to create common law." Northwest Airlines, 451 U.S. at 95 n.34.  The Court continued:

---

[26]  Of course, as noted, there is no express statement in CERCLA or SARA, or in their respective legislative histories, that PRPs engaged in voluntary cleanups can seek contribution.

57

> In almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt. The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement. . . . The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs.

Id. at 97 (citation and footnote omitted) (emphasis added). We echoed this understanding in Reading. See 115 F.3d at 1117 ("[W]hen Congress expressly created a statutory right of contribution in CERCLA § 113(f), 42 U.S.C. § 9613(f), it made that remedy a part of an elaborate settlement scheme aimed at the efficient resolution of environmental disputes. Permitting

58

independent common law remedies would create a path around the statutory settlement scheme, raising an obstacle to the intent of Congress.").[27]   Indeed, it would be odd to suppose that

---

[27]   DuPont counters with another rule of statutory construction: "that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."   Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot., 474 U.S. 494, 501 (1986).  It argues that Congress should not be deemed to have rejected a common law implied right of contribution without expressly saying so.  In Reading, however, we concluded that Congress did specifically replace all common law remedies with an express and exclusive statutory remedy, and with good reason: allowing PRPs to seek contribution only within the confines of § 113 provides a powerful incentive for them to settle their liability, a prime goal of SARA.

Indeed, the legislative history of SARA reveals that Congress approved expressly of certain prior cases, and none of them involved a PRP that voluntarily cleaned up its site without having settled or been sued.  The House Energy and Commerce Committee reported that it agreed with United States v. S.C. Recycling & Disposal, Inc., 653 F. Supp. 984 (D.S.C. 1986) (which held PRPs jointly and severally liable to the United States and suggested, in keeping with ordinary contribution rules, that upon being held liable a PRP could seek contribution from other PRPs), and United States v. Ward, No. 83-63-CIV-5, 1984 WL 15710 (E.D.N.C. May 14, 1984) (which held that a PRP deemed jointly and severally liable can seek contribution from other PRPs under the common law), and explained that § 113 "clarifies and confirms the right of a person held jointly and

59

Congress would have expressly provided a contribution right for PRPs that settled or were sued as part of an elaborate statutory scheme to encourage settlement if it intended that all other PRPs would be able to obtain contribution under some implied or common law right.

It might be argued, however, that CERCLA's general purpose (i.e., prompt and effective cleanup) is accomplished by any sort of cleanup (whether pursuant to a settlement, in response to a suit, or voluntarily). Under this view, SARA's preference for settlement and its express provision of contribution as an incentive to seek settlement should not be deemed to preclude reconsideration of precedents that, in light of Cooper Industries, now serve as a barrier to certain cleanups that would otherwise satisfy the desire for prompt and effective action.

We disagree with this argument. Of particular concern to the Congress that enacted SARA was setting standards likely to effect the safe and effective cleanup of contaminated sites in

---

severally liable under CERCLA to seek contribution from other potentially liable parties." H.R. Rep. No. 99-253(I), at 79, reprinted in 1986 U.S.C.C.A.N., at 2861 (emphasis added); see also id. at 74, reprinted in 1986 U.S.C.C.A.N., at 2856 (noting that the Committee "fully subscribes to the reasoning" in United States v. Chem-Dyne Corp., 572 F. Supp. 802 (S.D. Ohio 1983), that PRPs are jointly and severally liable to third parties).

a manner beneficial to the public interest. See, e.g., CERCLA § 121, 42 U.S.C. § 9621 (requiring "[t]he President [to] select a remedial action that is protective of human health and the environment, that is cost effective, and that utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable," and setting standards for meeting this requirement); Ohio v. EPA, 997 F.2d 1520, 1526 (D.C. Cir. 1993) (noting that "the statute . . . require[s] that remedial actions at Superfund sites result in a level of cleanup or standard of control that at least meets the legally applicable or otherwise relevant and appropriate federal (or stricter state) requirements," particularly the "legally 'applicable' or 'relevant and appropriate' environmental standards" in the National Contingency Plan ("NCP")). The House Committee on Public Works and Transportation explained that the EPA must consider, inter alia, "the availability of technology, the installation period, the uncertainties related to the level of performance or the solution or remedial action, the level of public support for the solution or remedial action, and whether or not the solution or remedial action has been achieved in practice at any other facility or site which has characteristics similar to the facility or site concerned." H.R. Rep. No. 99-253(V), at 50, reprinted in 1986 U.S.C.C.A.N., at 3173.[28]

---

[28] In fact, under CERCLA § 122(e)(6), 42 U.S.C. § 9622(e)(6), Congress expressly forbade, without the EPA's approval, remedial actions by PRPs once an administrative order

Indeed, before SARA was enacted, the EPA expressed serious doubts about sua sponte voluntary cleanups by PRPs. In the 1983 amendment to the NCP that added the National Priorities List for site cleanup, the EPA explained that, by designating certain sites as subject to "Voluntary or Negotiated Response," its strong preference was for negotiated cleanups with Government oversight.[29]

> Sites are included in this category if private parties are taking response actions pursuant to a consent order or agreement to

or consent decree was in place. As Senator Mitchell explained, "[t]his [provision] is to avoid situations in which the PRP begins work at a site that prejudges or may be inconsistent with what the final remedy should be or exacerbates the problem." 132 Cong. Rec. S14919 (daily ed. Oct. 3, 1986).

[29] This does not, of course, mean that only federal Government oversight is allowed. See United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1418 (6th Cir. 1991) ("The federal legislative scheme and its history are persuasive that Congress did not intend to leave the cleanup under CERCLA solely in the hands of the federal government. CERCLA, as amended by SARA, provides a substantial and meaningful role for the individual states in the selection and development of remedial actions to be taken within their jurisdictions.").

which EPA is a party. Voluntary or negotiated cleanup may include actions taken pursuant to consent orders reached after EPA has commenced an enforcement action. This category of response may include remedial investigations, feasibility studies, and other preliminary work, as well as actual cleanup.

Several commenters were concerned that this category did not adequately reflect voluntary response efforts undertaken without formal agreements with EPA. However, EPA studies have shown that many of the response actions undertaken by private parties outside the sanction of EPA consent agreements have not been successful. Furthermore, some private parties have represented routine maintenance or waste management activities as response actions, thereby leading to the conclusion that only after a thorough technical review can the

Agency describe actions by private parties as "responses". Thus, EPA believes that to describe actions taken outside consent orders as "response" would in many instances be misleading to the public[,] as EPA cannot assure the public that the actions are appropriate, adequate, consistent with the NCP, and are being fully implemented. Therefore, the Agency encourages any responsible parties who are undertaking voluntary response actions at NPL sites to contact the Agency to negotiate consent agreements.

This is not intended to preclude responsible parties from taking voluntary response actions outside of a consent agreement. However, in order for the site to be deleted or to be noted in the voluntary or negotiated response category, EPA must still sanction the completed cleanup. If the remedial action is not fully implemented or is not consistent

with the NCP, the responsible party may be subject to an enforcement action. Therefore, most responsible parties may find it in their best interest to negotiate a consent agreement.

Amendment to National Oil and Hazardous Substance Contingency Plan, 48 Fed. Reg. 40,661 (Sept. 8, 1983) (emphasis added).[30]

---

[30] Although the EPA treats innocent parties more generously than wrongdoing PRPs, it expressed a similar concern with respect to cost recovery by innocent parties in the substantive amendment to the NCP implementing SARA:

> EPA believes that it is important to encourage private parties to perform voluntary cleanups of sites, and to remove unnecessary obstacles to their ability to recover their costs from the parties that are liable for the contamination. At the same time, EPA believes it is important to establish a standard against which to measure cleanups that qualify for cost recovery under CERCLA, so that only CERCLA-quality cleanups are

65

There is, of course, no explicit indication in SARA or the legislative history that Congress was motivated by these

encouraged. . . . [Thus,] in evaluating whether or not a private party should be entitled to cost recovery under CERCLA section 107(a)(4)(B), EPA believes that "consistency with the NCP" should be measured by whether the private party cleanup has, when evaluated as a whole, achieved "substantial compliance" with potentially applicable requirements, and resulted in a CERCLA-quality cleanup.

. . .

[T]he government has a strong interest in ensuring that cleanup actions that derive a benefit from CERCLA section 107(a)(4)(B) — a statute under the charge of EPA — are performed in an environmentally sound manner; thus, it is appropriate to provide a standard or measure of consistency with the NCP.

National Oil and Hazardous Substance Contingency Plan, 55 Fed. Reg. 8666, 8792-93, 8794 (March 8, 1990).

concerns in amending CERCLA to encourage settlement. But the import of Congress' scheme (an express desire to oversee cleanups via settlements and other enforcement actions, the explicit promise of contribution as an incentive for PRPs to enter negotiated cleanup agreements, and the desire for quality-control standards for safe, effective, and reliable cleanups) is consistent with the EPA's wariness of wholly voluntary and unregulated cleanups. As the attorneys who prevailed in Cooper Industries argue in a recent article,

> [a]ny suggestion that section 107(a) offers some other federal recourse to PRPs seeking a contribution remedy under CERCLA is . . . undermined by the settlement scheme that Congress devised with its enactment of section 113's contribution provision. Specifically, under the SARA amendments, those who settle their cleanup claims with federal or state authorities receive an explicit right of contribution against other PRPs under section 113(f)(3)(B), as well as statutory protection under section 113(f)(2) from possible future contribution actions by other responsible parties.

67

> Protecting the integrity of this legislative scheme to incentivize settlements was a key factor for the federal circuit courts in universally determining that parties responsible for the site contamination may not assert section 107(a) actions seeking to recover their cleanup costs from other responsible parties, but must instead . . . seek contribution under section 113(f)(1).

William Bradford Reynolds & Lisa K. Hsiao, The Right of Contribution Under CERCLA After Cooper Industries v. Aviall Services, 18 Tul. Envtl. L.J. 339, 349-50 (2005) (footnotes omitted) (citing, inter alia, Reading, 115 F.3d at 1119); see also id. at 353 (contending that CERCLA's purpose was never to "encourag[e] wholly unsupervised private remediation activities," but rather to "facilitat[e] government-sponsored cleanups").

To be sure, other courts have concluded that because CERCLA's general goal was to assure prompt and effective cleanups, and sua sponte cleanups by PRPs may be prompt and effective, those PRPs must be able to seek contribution. See, e.g., Atlantic Research Corp. v. United States, __ F.3d __, 2006 WL 2321185, at *7-9 (8th Cir. Aug. 10, 2006); Consol. Edison,

423 F.3d at 99-100; City of Bangor v. Citizens Commc'ns Co., __ F. Supp. 2d __, 2006 WL 1868332, at \*41 (D. Me. June 27, 2006) (citing Consol. Edison, 423 F.3d at 100); Viacom, Inc. v. United States, 404 F. Supp. 2d 3, 8 (D.D.C. 2005). We believe, however, that a thorough review of CERCLA, as amended by SARA, does not support this conclusion. Congress intended to allow contribution for settling or sued PRPs as a way to encourage them to admit their liability, settle with the Government, and begin expeditious cleanup operations pursuant to a consent decree or other agreement. Our precedents recognize this "elaborate settlement scheme," see Reading, 115 F.3d at 1117, and if we were to revisit them now, we would risk upsetting Congress' carefully chosen remedy.[31] In any event,

---

[31] DuPont makes the interesting argument that Congress' scheme effectively allows the federal Government to avoid liability in contribution for its actions as a PRP. It contends that the EPA is generally prohibited from pursuing CERCLA actions against other federal agencies, and thus "the government's liability under CERCLA will almost invariably be in contribution." Appellants' Br. at 41-42 (citing Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987)). If private PRPs may only seek contribution from the United States (as a PRP) if there is a preexisting action under § 106 or § 107 or settlement under § 113(f)(3)(B), DuPont argues, the Government could use its "many options for exercising its enforcement discretion to avoid governmental liability under CERCLA." Id. at 42. As noted in footnote 18 above, the Eighth Circuit accepted this argument recently in Atlantic Research, 2006 WL 2321185, at

69

the legislative history of CERCLA, when read in conjunction with that of SARA, simply does not show that our precedents are at odds with Congress' intent.[32]

---

*8.

DuPont does not, however, provide evidence that the EPA actually uses its enforcement discretion to avoid subjecting other federal agencies to potential liability in a later contribution suit (nor did the Eighth Circuit cite such evidence in its decision). Indeed, it would in many cases be difficult for the EPA to do so because, under principles of joint and several liability, the initial suit or settlement does not involve other tortfeasors, who are identified and deemed liable in later proceedings. Also, the federal Government has little or no control over suits by innocent landowners or state enforcement actions, both of which would serve as a predicate for § 113(f)(1) contribution.

[32] Nor do we have cause to reconsider New Castle County's holding that cost recovery under § 107 is only available to innocent parties. In Consolidated Edison, the Second Circuit found "no basis for reading into [§ 107] a distinction between so-called 'innocent' parties and [PRPs]," and suggested in a footnote that the concern expressed in New Castle County (that it would be illogical to allow a PRP to recover all of its costs on the same basis as an entirely blameless party) was "misplaced," because "there appears to be no bar precluding a person sued under section 107(a) from bringing a counterclaim under section 113(f)(1) for offsetting contribution against the plaintiff volunteer who, if sued, would be liable under section 107(a)."

70

423 F.3d at 99-100 & n.9.  We make three observations.

First, the Second Circuit declined explicitly to consider "whether a three-judge panel of this court may depart from Bedford Affiliates's section 107(a) holding" because it deemed Bedford Affiliates factually distinguishable.  Consol. Edison, 423 F.3d at 100-01 & n.12.  But it is hard to see how the later panel could simply assert there is "no basis" for limiting § 107 cost recovery suits to innocent parties when Bedford Affiliates (like our decision in New Castle County) plainly held the opposite.  See Bedford Affiliates, 156 F.3d at 424 ("[O]ne potentially responsible person can never recover 100 percent of the response costs from others similarly situated since it is a joint tortfeasor — and not an innocent party — that ultimately must bear its pro rata share of cleanup costs under § 107(a). . . . Congress planned that an innocent party be able to sue for full recovery of its costs [under § 107] while a party that is itself liable may recover only those costs exceeding its pro rata share of the entire cleanup expenditure, i.e., contribution under § 113(f)(1).").

Second, the Second Circuit's proposed procedure — allowing a PRP "volunteer" to obtain full cost recovery, but then subjecting it to a counterclaim by other PRPs for "offsetting contribution" to avoid unjust enrichment — seems quite unwieldy and is, in any event, not contemplated by CERCLA or SARA.

Third, and perhaps most importantly, although another Circuit's views are entitled to due weight by our Court, they are not "intervening authority" that would justify our reconsideration of our precedents without en banc review.

71

### d. Public Policy Arguments

Of course, it could be that encouraging <u>sua sponte</u> voluntary cleanups by capable PRPs is in the public's interest, and would be a better way to protect health and the environment than pressuring them into settlement agreements. This is not self-evident, however. As Judge Sand recently observed, limiting contribution rights to settling or sued PRPs

> would pressure PRPs to settle with some government regarding their own liability for polluting a site, if they wanted to obtain contribution from others also responsible for polluting that site. There is nothing necessarily irrational about requiring a PRP that voluntarily goes to court to obtain cost

---

Indeed, we note that at least one other Circuit Court has agreed with our interpretation of § 107(a) in a case decided after <u>Consolidated Edison</u>. <u>See</u> <u>Elementis Chromium L.P. v. Coastal States Petrol. Co.</u>, 450 F.3d 607, 613 (5th Cir. 2006) ("[W]hen one liable party sues another liable party under CERCLA, the action is not a cost recovery action under § 107(a), and the imposition of joint and several liability is inappropriate." (internal quotation marks omitted) (alteration in original)).

> reimbursement [through
> contribution], as opposed to being
> dragged into court by another party,
> to either prove its 'innocence' . . .
> or officially admit its 'guilt' (via a
> settlement); such a forced choice
> would be entirely consistent with
> Congress's intent.

Elementis Chems., Inc. v. TH Agric. & Nutrition, L.L.C., 373 F. Supp. 2d 257, 272 (S.D.N.Y. 2005).

But we need not linger on this particular issue. The fact that DuPont and the other appellants, if they are allowed contribution for response costs voluntarily incurred, may be capable of reaching a good result without the Government oversight provided for in SARA, is not a reason to reconsider our prior holdings that the statute precludes such causes of action. And, in any event, the debate over whether our national environmental cleanup laws should favor prompt and effective cleanups in any manner (including sua sponte voluntary cleanups by PRPs), or should favor settlements and other enforcement actions to ensure that wrongdoers admit their fault and fix the problem under the aegis of Government oversight, is a matter for Congress, not our Court. See Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 646 (1981) ("The policy questions presented by petitioner's claimed right to contribution are far-reaching. In declining to provide a right to contribution,

73

we neither reject the validity of those arguments nor adopt the views of those opposing contribution. Rather, we recognize that, regardless of the merits of the conflicting arguments, this is a matter for Congress, not the courts, to resolve."). Congress sets policy. We steer clear of such matters, as our function is to interpret the statutes Congress enacts to reflect its policy choices.

*   *   *   *   *

Having determined that New Castle County and Reading control this case, and that neither the Supreme Court's decision in Cooper Industries nor the purpose of CERCLA (as amended by SARA) provide cause to reexamine those precedents, we must refuse DuPont's invitation to imply a cause of action for contribution under § 107 or the common law available to PRPs engaged in sua sponte voluntary cleanups. We are aware, of course, that other courts have held differently, but we do not believe those decisions can be reconciled with SARA.

## V. Judgment on the Pleadings

Because appellants cannot seek contribution for their voluntary cleanup efforts (and, hence, the District Court's December 30, 2003 order, as amended on January 8, 2004, must be affirmed), we proceed to consider whether the District Court erred in granting the Government judgment on the pleadings with respect to the remaining fourteen sites at issue in this

74

litigation. Our review of judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is "confined to the allegations in the pleadings," and we "must accept [the non-movant's] version of events as true." Consol. Rail Corp. v. Portlight, Inc., 188 F.3d 93, 98 (3d Cir. 1999). The motion should be granted if "there is no material issue of fact to resolve," Mele v. Fed. Res. Bank of N.Y., 359 F.3d 251, 253 (3d Cir. 2004) (internal quotation marks omitted), and neither we nor the District Court may "consider matters extraneous to the pleadings" in deciding whether there are material facts in dispute. Id. at 256 n.5 (internal quotation marks omitted).

The District Court concluded that, although appellants asserted they could introduce evidence that some of the other sites were being cleaned up pursuant to EPA consent decrees (and thus might qualify for § 113(f)(1) contribution), they never did introduce that evidence, nor did they seek to amend their complaint. Thus, based solely on the pleadings, the District Court granted judgment to the Government because appellants' complaint did not allege any facts that would suggest the circumstances of the cleanups at other sites were different from those at DuPont's Louisville facility. DuPont argues that, since discovery had not yet proceeded with respect to any of the other sites, it was premature to conclude that the circumstances at those sites were the same as in Louisville. This is not, however, what the District Court concluded. Rather, it rightly noted that appellants bore the burden of pleading facts sufficient to show they could obtain § 113 contribution. Surely they did not need

75

discovery to determine whether cleanups at some of their sites were pursuant to a suit, settlement, or consent decree.

A straightforward reading of appellants' complaint reveals no allegation that any site was cleaned up pursuant to some kind of suit or settlement. The complaint merely describes the Government's alleged actions that contributed to contamination at each site, without any reference to the current cleanup operations. The only discussion of the cleanup operations reveals that appellants "have undertaken, and are undertaking, response actions with respect to the Facilities in response to releases or threatened releases of hazardous substances, and have incurred and are incurring necessary costs of response consistent with the NCP." Thus, based solely on the pleadings, appellants have not set out facts sufficient to demonstrate, even by inference, that they could possibly prevail on their claim for contribution under § 113.[33]

---

[33] After this appeal was filed, the Government learned that in 2001 the EPA sued DuPont under § 107(a) regarding contamination at the Necco Park facility in Niagara, New York. See Gov't Br. at 57 n.25. Thus, the Government recommends that any dismissal of DuPont's claim with respect to that site be without prejudice. Since the EPA brought suit in 2001 (two-and-a-half years before the District Court issued its final judgment in this case), we are reluctant to allow DuPont a second bite at this apple for the same reasons we believe its claims with respect to the other facilities were properly

## VI. Conclusion

We are not, of course, unsympathetic to the policy arguments made by appellants. Nothing in our decision, however, forces them to sit on contaminated sites and wait to be sued, endangering public health all the while. They can, consistent with SARA, approach the EPA or a state environmental agency and settle their liability, and then seek contribution from others. If indeed they desire to be good corporate citizens (which their sua sponte voluntary cleanups suggest is the case), we have little doubt they will seek settlement rather than wait to be sued. They are not, of course, guaranteed terms in a settlement as favorable as those they would enjoy if they cleaned up a contaminated site entirely on their own, but this is an inescapable consequence of Congress' plan. That plan, recognized and protected in our precedents, was left untouched (and arguably strengthened) by Cooper Industries, and we therefore have no cause to reconsider our precedents here.

---

dismissed. The Government nonetheless is willing to subject itself to a suit for contribution regarding the Necco Park facility. In this context, and even though DuPont (surprisingly) did not bring the suit to the District Court's attention, we abide the Government's request. Insofar as the Necco Park facility is concerned, the District Court's March 1, 2004 order is converted to a dismissal without prejudice.

77

For these reasons, the District Court's December 30, 2003 order (as amended on January 8, 2004) is affirmed. Its March 1, 2004 order is also affirmed, with the caveat that the District Court's dismissal of the contribution claim regarding DuPont's Necco Park facility in Niagara, New York is converted to a dismissal without prejudice.

SLOVITER, <u>Circuit Judge</u>, <u>dissenting</u>.

Judge Ambro has written a fine opinion in support of the majority's position that plaintiff DuPont does not have a right to contribution from the United States for its voluntary cleanup of a site that was polluted by the United States as well as by DuPont. I reach a conclusion different from that reached by the majority and write so that this view can be considered along with that of the majority. Because Judge Ambro's opinion fully sets forth the legal background, I make every effort to avoid repetition.

The majority concludes that DuPont cannot maintain this action against the United States for contribution for cleanup costs under CERCLA § 107 because of our decisions in <u>New Castle County v. Halliburton NUS Corp.</u>, 111 F.3d 1116 (3d Cir. 1997), and <u>In re</u> <u>Reading Co.</u>, 115 F.3d 1111 (3d Cir. 1997). Although this court adheres strictly to our precedents, we have made clear that those precedents may be reevaluated when there has been intervening authority. <u>See</u> <u>George Harms Constr. Co. v. Chao</u>, 371 F.3d 156, 161 (3d Cir. 2004) ("We recognize that we may reevaluate a precedent in light of intervening authority even without en banc consideration."); <u>Reich v. D. M. Sabia Co.</u>, 90 F.3d 854, 858 (3d Cir. 1996) ("Although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel . . . , a panel may reevaluate a precedent

79

in light of intervening authority[.]").

Such reevaluation of precedent is appropriate here even though, as the majority correctly notes, we must be particularly cautious in revisiting cases involving questions of statutory interpretation. Indeed, the Supreme Court has noted that in certain circumstances courts may appropriately overrule statutory precedents. It has explained that in "cases where statutory precedents have been overruled, the primary reason for the Court's shift in position has been the intervening development of the law, through either the growth of judicial doctrine or further action taken by Congress. Where such changes have removed or weakened the conceptual underpinnings from the prior decision, or where the later law has rendered the decision irreconcilable with competing legal doctrines or policies, the Court has not hesitated to overrule an earlier decision." Patterson v. McLean Credit Union, 491 U.S. 164, 173 (1989) (citations omitted).

The Supreme Court's decision in Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157 (2004), is such intervening authority. It should impel us to reevaluate our precedent because Cooper Industries weakens the conceptual underpinnings of our decisions in Reading and New Castle

80

<u>County</u>.  For that reason, and because our holdings in <u>Reading</u> and <u>New Castle County</u> cannot be reconciled with the policies Congress sought to encourage when it enacted CERCLA, I believe this court can and should reconsider those opinions.

There is nothing in the relevant language of § 107 that compels the result the majority reaches.  Section 107 states that various parties, including the owner or operator of a facility, may be responsible for "any . . . necessary costs of response incurred by any other person consistent with the national contingency plan," § 107(a)(4)(B), and provides a cause of action to parties that incur cleanup costs but have not themselves been sued under § 106 or § 107.[34]  For years after the 1980

[34]  In <u>New Castle County</u>, we stated only that innocent parties may bring suit under § 107.  Our imposition of the "innocent" standard on parties seeking to bring suit under § 107 is not based on the statutory text.  Arguably, the "innocent" standard imposed by this and other circuits violates fundamental rules of statutory construction by imposing a requirement not evident on the statute's face.  This court-created standard ignores the fact that § 107(a)(4)(B) plainly allows a private party plaintiff to be "any other person" besides the government, state, and Indian tribes and does not expressly exclude parties that may be responsible for a spill.  Moreover, courts that adopt this standard narrowly interpret § 107 and ignore that CERCLA is a remedial statute, which courts are to construe liberally in order to achieve

enactment of CERCLA, district courts almost unanimously found that § 107 contained an implied cause of action for contribution. See, e.g., United States v. New Castle County, 642 F. Supp. 1258, 1265-69 (D. Del. 1986) (holding that contribution right arises under federal common law); Colorado v. ASARCO, Inc., 608 F. Supp. 1489-91 (D. Colo. 1985) (same); Wehner v. Syntex Agribusiness, Inc., 616 F. Supp. 27, 31 (E.D. Mo. 1985) (holding that contribution right is implied from language of § 107(e)(2)). With the enactment of § 113, the courts turned to that section rather than to § 107 to provide the cause of action.

In New Castle County, this court stated that § 113 provided a "potentially responsible person[] with the appropriate vehicle" to "recoup that portion of its expenditures which exceeds its fair share of the overall liability." 111 F.3d at 1122. We further held that "a section 107 action brought for recovery of costs may be brought only by *innocent* parties that have undertaken clean-ups." Id. at 1120. Similarly, in Reading, we held that a potentially responsible party may not seek contribution under § 107(a)(4)(B). In fact, we stated "§ 113(f)(1) specifically permits an action for contribution to be brought in the absence of civil action under section 107." 115

its intended purposes – namely the prompt cleanup of hazardous sites.

82

F.3d at 1120 (internal punctuation and quotation marks omitted).

The trend toward application of § 113 was halted by the Supreme Court's decision in Cooper Industries, where the Court held that the plain language of § 113(f)(1) does not allow liable parties to bring contribution actions unless and until a related civil action is brought against them under either § 106 or § 107. The Court reserved judgment on the question whether liable parties who are not subject to an action under § 106 or § 107 may instead seek relief under § 107(a)(4)(B).

Cooper Industries clearly undermined our opinions in Reading and New Castle County. In those cases, we assumed that all potentially responsible parties — those whose responsibility had been adjudicated and those who voluntarily admitted their responsibility — fell into the same category of "potentially responsible parties" who could recoup losses by bringing suit pursuant to § 113(f). The Supreme Court's decision in Cooper Industries established that our understanding of the category "potentially responsible parties" was incorrect. Cooper Industries holds that a party who has in fact been held responsible (via adjudication or settlement with the EPA) may bring an action under § 113(f), while a party who admits responsibility but whose responsibility has not been established

83

may not. Cooper Industries highlights the fact that the term "potentially responsible party" is "vague and imprecise because, when no action has been filed nor fact-finding conducted, *any* person is *conceivably* a responsible party under CERCLA." Consolidated Edison Co. of New York v. UGI Utilities, Inc., 423 F.3d 90, 97 n.8 (2d Cir. 2005), petition for cert. filed, 74 U.S.L.W. 3600 (U.S. Apr. 14, 2006) (No. 05-1323).[35]

In addition, Reading and New Castle County are clearly factually distinguishable from the situation before us. In New Castle County, plaintiffs already had been sued by the Government and then brought an action against other potentially responsible parties to recover response costs under §

---

[35] The majority holds that our erroneous observation in Reading that "§ 113(f)(1) specifically permits an action for contribution to be brought 'in the absence of a civil action under . . . section [107],'" 115 F.3d at 1120, does not fatally undermine Reading's holding. I respectfully disagree. Cooper Industries clearly establishes that § 113(f) did not, as we stated, "replace[] the judicially created cause of action under § 107(a)(4)(B) to the extent that a party seeks contribution." Reading, 115 F.3d at 1120. That judicially created cause of action was available to parties that had not been sued under § 106 or § 107. Our broad reading of § 113(f) in Reading is fundamentally at odds with the Supreme Court's understanding of § 113(f) in Cooper Industries.

84

107(a)(4)(B).  This court held that plaintiffs could not assert a cause of action under § 107 and restricted them to making a claim for contribution under § 113(f).  <u>See</u> 111 F.3d at 1116.  Similarly, in <u>Reading</u>, the plaintiff had already been sued under § 107.  <u>See</u> 115 F.3d at 1116.  In the instant case, DuPont has not been ordered to undertake remedial action.  Rather, it voluntarily cleaned up numerous hazardous sights.  Any statements this court made regarding the ability of parties against whom § 106 or § 107 actions had not been brought to sue under § 107 or § 113 were not necessary to answer the questions presented by those cases and need not govern our analysis in this case.

Two of our sister circuits have recently considered the same issue presented here and both have decided, contrary to the majority, that section 107(a) can be used by a responsible party to seek contribution from another responsible party.  In <u>Consolidated Edison</u>, the Court of Appeals for the Second Circuit unanimously held,

> We believe . . . that Con Ed may pursue its suit under section 107(a) because, in light of *Cooper Industries*, Con Ed's costs to clean up the sites of the Westchester Plants are "costs of

85

response" within the meaning of that section.

423 F.3d at 97.

The Second Circuit, like this court, had held, before the Cooper Industries decision, that CERCLA section 113(f) governs contribution actions and that the plaintiff could not pursue a section 107(a) cost recovery claim against the defendants. Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir. 1998). The Supreme Court's decision in Cooper Industries convinced the Second Circuit to change its view. As the court explained in Consolidated Edison:

> [The Cooper Industries] decision impels us to conclude that it no longer makes sense to view section 113(f)(1) as the means by which section 107(a) cost recovery remedy is effected by parties that would themselves be liable if sued under section 107(a).

86

423 F.3d at 99. The court further stated that it "would be impermissibly discouraging voluntary cleanup were we to read section 107(a) to preclude parties that, if sued, would be held liable under section 107(a) from recovering necessary response costs." Id. at 100.

The court thus concluded, "that section 107 permits a party that has not been sued or made to participate in an administrative proceeding, but that if sued, would be held liable under section 107(a), to recover necessary response costs incurred voluntarily, not under a court or administrative order or judgment." Id.

Just this month, the Court of Appeals for the Eighth Circuit, again unanimously, reached a similar conclusion. In Atlantic Research Corp. v. United States, the court held that: "[A] private party which voluntarily undertakes a cleanup for which it may be held liable, thus barring it from contribution under CERCLA's § 113, may pursue an action for direct recovery or contribution under § 107, against another liable party." No. 05-3152, 2006 WL 2321185, at *9 (8th Cir. 2006).

87

Atlantic Research, the plaintiff in the Eighth Circuit decision, was in a position almost identical to that of DuPont here in that it sought to recover contribution for cleanup from the United States for cleanup services it performed at a facility where it retrofitted rocket monitors for the United States. The court, like the Second Circuit in Bedford Affiliates, had held in Dico Inc. v. Amoco Oil Co., 340 F.3d 525, 531 (8th Cir. 2003), that a liable party could not bring an action under section 107. The Eighth Circuit, like the Second Circuit, reconsidered that earlier holding in light of the decision in Cooper Industries and did an about face. I believe that this court's earlier decisions in New Castle County and In re Reading Co. are similarly superseded by the decision in Cooper Industries.

Both the Second and the Eighth Circuits's decisions cited the Supreme Court's decision in Key Tronic Corp. v. United States, 511 U.S. 809 (1994). In that case, which concerned attorney's fees under CERCLA, the Supreme Court recognized that a potentially responsible party could seek recovery of response costs under § 107, but the Justices differed as to whether there was an express or implied cause of action. Justice Ginsburg, in her dissent in Cooper Industries, stated that every Member of the Court in Key Tronic agreed that a potentially responsible party which incurred necessary costs could recover those costs from another liable party in an action under § 107(a). Cooper Industries, 543 U.S. at 172. Significantly, the plaintiff

88

in <u>Key Tronic</u> was a party responsible for polluting and was still permitted to bring suit under § 107. As the Court of Appeals for the Second Circuit recently stated, <u>Cooper Industries</u> and the text of § 107 clearly "impel[] us to conclude that it no longer makes sense to view section 113(f)(1) as the means by which the section 107(a) cost recovery remedy is effected by parties that would themselves be liable if sued under section 107(a)." <u>Consolidated Edison</u>, 423 F.3d at 99. Rather, § 107(a) and § 113(f)(1) embody mechanisms for cost recovery available to persons in different procedural postures. <u>Id.</u>

Contrary to the majority, I believe that permitting parties who voluntarily incur cleanup costs to bring suit under § 107 comports with the fundamental purposes of CERCLA. As this court noted in <u>Horsehead Industries, Inc. v. Paramount Communications, Inc.</u>, 258 F.3d 132 (3d Cir. 2001):

> The purpose of CERCLA is "to assure that the current and future costs associated with hazardous waste facilities, including post-closure costs, will be adequately financed and, to the greatest extent possible, borne by the owners and operators of such facilities."

Id. at 135 (quoting 42 U.S.C. § 9607(k)(6)(E)); see OHM Remediation Services v. Evans Cooperage Co., 116 F.3d 1574 (5th Cir.1997) (noting CERCLA's broad, remedial purpose to facilitate prompt cleanup of hazardous waste sites and to shift costs of environmental response from taxpayers to parties who benefitted from wastes that caused harm); see also In re Tutu Water Wells CERCLA Litig., 326 F.3d 201, 206 (3d Cir. 2003) (stating that CERCLA's purpose is "making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created") (citation and quotation marks omitted).

Voluntary cleanups are vital to fulfilling CERCLA's purpose. During deliberations on the SARA Amendments, Congress emphasized the importance of voluntary action, stating that "[v]oluntary cleanups are essential to a successful program for clean up of the Nation's hazardous substance pollution problem." H.R. Rep. No. 99-253, pt. 5, at 58 (1985); see also 131 Cong. Rec. 24725, 24730 (1985) (statement of Sen. Domenici) ("The goal of CERCLA is to achieve effective and expedited cleanup of as many uncontrolled hazardous waste facilities as possible. One important component of the realistic strategy must be the encouragement of voluntary cleanup actions or funding without having the President relying on the panoply of administrative and judicial tools available.").

The majority reads the legislative history of SARA as strongly indicating that Congress did not mean to encourage unsupervised voluntary cleanups, but rather cleanups within the bounds of settlement agreements. See Maj. Op. at IV.B.2(b). The majority notes that the EPA expressed serious doubts about the efficacy of voluntary cleanups by parties.[36] See Maj. Op. at IV.B.2(c). These assertions, part of a long and fractious legislative history, are not dispositive. Though supervised cleanups are to be encouraged wherever possible, they need not be encouraged at the expense of unsupervised cleanups. Section 107(a)(4)(B) holds a party liable for costs incurred in a cleanup (voluntary or otherwise) only insofar as those costs are "costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. 9607(a)(4)(B). A party that seeks contribution for costs incurred in a cleanup that does not comport with the national contingency plan is without

---

[36] The EPA's approach to voluntary cleanups has varied. The majority argues that the EPA was wary of such cleanups prior to the enactment of SARA. However, the EPA has also expressed concern that the position advocated by the United States and adopted by the Supreme Court in Cooper Industries could undermine EPA's voluntary cleanup program by removing an incentive for liable parties to voluntarily clean up contaminated sites because it would make it more difficult to seek reimbursements. See Ruling on Superfund Costs May Boost Push for Supreme Court Review, INSIDE THE EPA, Jan. 9, 2004, sec. 2, *available at* 2004 WLNR 70249.

recourse.[37]

The position urged by DuPont here is an alternative and equally effective, albeit voluntary, method of assuring cleanup in compliance with CERCLA. See Kotrous v. Goss-Jewett Co. of N. Cal., No. Civ. S02-1520, 2005 WL 1417152, at *3 (E.D. Cal. June 16, 2005) (holding that a potentially responsible party may maintain a claim for contribution under § 107(a)); Metro. Water Reclamation Dist. v. Lake River Corp., 365 F. Supp. 2d 913, 918 (N.D. Ill. 2005) (explaining that "although PRP's are not explicitly named in § 107(a), there seems to be no reason why they would be excluded from the provision that allows recovery for any person"); Vine St. LLC v. Keeling, 362 F. Supp. 2d 754, 761-64 (D. Tex. 2005) (holding that potentially responsible party could bring claim under § 107(a)); cf. Atl. Research Corp. v. United States, No. 02-CV-1199, 2005 U.S. Dist. LEXIS 20484, at *10 (W.D. Ark. June 1, 2005) (suggesting the Eighth Circuit revisit its precedents after noting "that the result . . . is patently unfair to ARC, because it has voluntarily cleaned up environmental contamination, yet it is left without a CERCLA remedy against the United States, another PRP").

---

[37] By the plain text of the statute, parties that fail to meet the national contingency plan standards cannot be reimbursed for such activities.

As the majority itself notes, SARA was "not intended to preclude responsible parties from taking voluntary response actions outside a consent agreement." Maj. Op. at IV.B.2(c). I am concerned that the effect of the majority's opinion will be that parties will be reluctant to engage in voluntary cleanups for fear that they may not be able to obtain contribution. Spills that could be most efficaciously dealt with if cleaned up immediately will remain untouched while parties attempt to settle with the Government. This result is contrary to the purpose of CERCLA. Therefore, I respectfully dissent.